OTI KAGA, INC., Plaintiff,

v.

SOUTH DAKOTA HOUSING DEVEL-
OPMENT AUTHORITY, William Ear-
ley, Daryls Baum, John Rothstein,
Kevin Culhane, Lynn Hager, Thomas
Schramm and Leland Kleinsasser, De-
fendants.

No. CIV 00–3009, 2002DSD 1.

United States District Court,
D. South Dakota,
Central Division.

Feb. 8, 2002.

James G. Abourezk, Abourezk Law Offices, PC, Sioux Falls, Mark S. Berry, Litteton, CO, for Plaintiff.

Michael L. Luce, Mark F. Marshall, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for Defendants.

## MEMORANDUM DECISION AND ORDER

KORNMANN, District Judge.

[¶ 1.] Plaintiff Oti Kaga, Inc. ("Oti Kaga") instituted this action against the South Dakota Housing Development Authority ("SDHDA") and its seven individual members (collectively "the defendants") due to an ongoing dispute concerning various federal housing programs. The dispute is twofold with a unifying theme, Oti Kaga alleges, of racial discrimination against Native Americans. The first dispute, which began in 1996, concerns the allocation of low income housing tax credits. The second dispute, which began in 1998, focuses on the awarding of grants under the HOME Investment Partnership Act, 42 U.S.C. §§ 12741 *et seq.* Oti Kaga claims that the decisions made by the defendants in the housing programs were motivated by invidious discrimination. The defendants, pursuant to Fed.R.Civ.P. 56, filed a motion for summary judgment, Doc. 46, on various grounds. After careful consideration of the briefs, the documents on file herein, the submitted depositions and affidavits, and the applicable law, the court concludes, for the reasons set forth below,

that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law.

[¶ 2.] Before proceeding further, the court must voice its displeasure with this case. Oti Kaga makes claims that are patently frivolous and seeks relief that is in total disregard of the United States Constitution. When these severe shortcomings, early on in this case, were brought to the attention of Oti Kaga's counsel in writing by the court, non-resident counsel responded quite disingenuously; instead of addressing the court's concerns, counsel chose to deflect and circumvent them. Counsel for Oti Kaga continue to advance claims that are frivolous and totally without legal merit.

## BACKGROUND

### A. The Parties

[¶ 3.] Oti Kaga, Inc. is incorporated under South Dakota law. It is a non-profit entity established by the Cheyenne River Sioux Tribal government, as authorized by the United States Housing Act of 1937, 42 U.S.C. §§ 1437 *et seq.* Oti Kaga was established to develop and construct low-income housing and to manage and operate low-income housing programs on the Cheyenne River Sioux Reservation.

[¶ 4.] Beyond the above description, Oti Kaga fails to describe its membership and its relation, if any, with the government of the Cheyenne River Sioux Tribe. It does appear, however, that the members of Oti Kaga are all Native Americans from the Cheyenne River Sioux Tribe. This has some significance because of the relief Oti Kaga seeks in this action. Oti Kaga, as a corporation, is the sole plaintiff in this action. The Cheyenne River Sioux Tribe is not a plaintiff. No individual Native Americans, from the Cheyenne River Sioux Tribe or elsewhere, are plaintiffs. Oti Kaga, as a corporation, stands alone.

[¶ 5.] SDHDA is "an independent public instrumentality" that exercises "essential public functions." SDCL 11–11–10. SDHDA has various responsibilities, one of which is to adopt a "tax credit allocation plan" pursuant to § 42 of the Internal Revenue Code, and to receive, rank, and award federal low income housing tax credits. In addition, SDHDA is responsible for the administration of the HOME Incentive Partnership Program in South Dakota. For purposes of these programs, SDHDA is an "agency of the state." SDCL 11–11–47.

[¶ 6.] Defendants William Earley, John Rothstein, Kevin Culhane, Lynn Hager, Thomas Schramm and Leland Kleinsasser are members of the SDHDA Board of Commissioners. They have been sued in their individual and official capacities. Defendant Darlys Baum is the Executive Director of SDHDA and Secretary of the SDHDA Board of Commissioners. She is likewise sued in her individual and official capacities.

[¶ 7.] Before delving into the factual background of this dispute, the court will detail the two federal housing programs at issue in this case.

## B.  Tax Credit Allocation Program

[¶ 8.] The tax credit allocation program, as noted above, is authorized by Internal Revenue Code § 42. That section authorizes state housing credit agencies, like SDHDA, to allocate tax credits for the construction of low-income housing. In essence, the tax credits act as "carrots" to encourage various entities to construct low-income housing. Internal Revenue Code § 42(m) requires that all tax credits be allocated pursuant to a "qualified allocation plan," which must be adopted by the housing credit agency and which must be approved by the governmental unit of which such agency is a part. IRC § 42(m)(1)(A)(i).

[¶ 9.] In deciding which projects should receive tax credits, § 42(m) sets forth certain criteria which must be considered, including

(i) project location,

(ii) housing needs characteristics,

(iii) project characteristics, including whether the project includes the use of existing housing as part of a community revitalization plan,

(iv) sponsor characteristics,

(v) tenant populations with special housing needs,

(vi) public housing waiting lists,

(vii) tenant populations of individuals with children, and

(viii) projects intended for eventual tenant ownership.

IRC § 42(m)(1)(C)(i-viii).

[¶ 10.] In evaluating the above criteria, the housing credit agency is to consider

(i) the sources and uses of funds and the total financing planned for the project,

(ii) any proceeds or receipts expected to be generated by reason of tax benefits,

(iii) the percentage of the housing credit dollar amount used for project costs other than the cost of intermediaries, and

(iv) the reasonableness of the developmental and operational costs of the project.

IRC § 42(m)(2)(B)(i-iv). As noted above, SDCL 11–11–47 expressly denominates SDHDA as the housing credit agency for South Dakota.

## C.  HOME Program

[¶ 11.] The second federal housing program involved in this action is the HOME Investment Partnership Act ("HOME"), which is Title II of the Cranston–Gonzalez National Affordable Housing Act, codified at 42 U.S.C. §§ 12701 *et seq.* HOME funnels federal funds directly to participating

jurisdictions. The jurisdictions then disburse the funds in the form of loans and grants "to provide incentives to develop and support affordable rental housing and home ownership affordability." 42 U.S.C. § 12742(a)(1). Prior to 1998, Indian tribes were participating jurisdictions in HOME. *See* 42 U.S.C. § 12747(a)(2) (1996). In fact, HOME created a HOME set-aside for Indian tribes which allocated to them 1% of the total allocated HOME funds. *See id.* In addition to the set-aside, Indian tribes could also compete for HOME funds with other entities for money allocated to the states for distribution.

[¶ 12.] While the Indian set-aside still existed, the Department of Housing and Urban Development ("HUD"), the governmental agency that oversees the implementation of HOME, published detailed regulations. *See* 24 C.F.R. Part 92. At issue in this case is 24 C.F.R. § 92.201(b)(5), which states that "[a] State may fund projects on Indian reservations located within the State provided that the State includes Indian reservations in its consolidated plan." The consolidated plan is the document that is submitted to HUD which serves as the planning document of the jurisdiction and as an application for federal funding under HOME. *See* 24 C.F.R. § 91.5.

[¶ 13.] The regulation giving the states the discretion to fund projects located on Indian reservations worked in a rather uncontroversial manner in the pre–1998 context. As HOME existed prior to 1998, Indian tribes received their own HOME funds via the Indian set-aside. Given that set-aside, it made sense that the states were afforded the option of funding projects on Indian reservations, provided, of course, that the Indian projects were included in the state's consolidated plan.

[¶ 14.] In 1996, Congress passed the Native American Housing Assistance and Self–Determination Act ("NAHASDA"), 25

U.S.C. §§ 4101 *et. seq.*, which became effective October 31, 1997. NAHASDA dramatically changed HOME as it applied to Indian tribes. Specifically, NAHASDA repealed the Indian set-aside in HOME. *See* 42 U.S.C. § 12747. In repealing the HOME Indian set-aside and those like it in other federal housing programs, Congress intended to block-grant the money directly to Indian tribes so they would not have to come through the bureaucratic wranglings of Washington nor wait for money from state governments. *See* 142 Cong. Rec. H11603 (daily ed. Sept. 28, 1996) (remarks of Congressman Hayworth). In essence, with NAHASDA, Congress gave Indian tribes the right to decide how to best spend their federal housing dollars. *See id.*

[¶ 15.] Although the Indian set-aside in HOME was repealed, the HUD regulation giving states the discretion of whether to use state HOME funds on Indian projects remained unaltered. Thus, 24 C.F.R. § 92.201(b)(5) is still on the books. Its continued existence has spawned its own controversy, which this litigation exemplifies. In addition, the passage of NAHASDA has raised the question whether Indian tribes can participate in HOME for funds that are allocated to the states. Obviously Oti Kaga believes it can. Moreover, although it is rather unclear, there appears to be nothing that expressly precludes their involvement. As one commentator has noted, "[e]ligibility for American Indian tribes to participate in another housing block grant program was removed when NAHASDA became the *exclusive* formula grant for housing in lieu of the HOME program grant." Kenison, "Implementing NAHASDA: Brave New Word?," 8–SPG J. Affordable Housing & Community Dev. L. 253 (1999) (emphasis added). Some states, including South Dakota, seize this ambiguity and include the needs of Indian reservations in their HOME consolidated

plans. Once they receive their federal allocation, some states refuse to fund any projects in Indian Country. This, understandably, angers Native American entities. Their collective anger has been heard in high places, as a joint conference of Congress has stated the following:

> The conferees are concerned that there appears to be some ambiguity about whether Native American non-profit entities working on Indian lands are eligible to receive HOME funds. After reviewing the relevant statutes, the conferees see nothing that indicates Native American nonprofits are ineligible to compete for HOME funds at the state level. Furthermore, the conferees believe it is highly questionable for states to count low-income Native American residents in their funding calculations, but upon receipt of their allocation, be unwilling to share HOME funds with Native American nonprofits. Economic and housing conditions on Native American lands are among the most challenging in the United States. The HOME program was designed to assist in meeting these challenges for all Americans and not to discriminate based on where an individual chooses to live.

H.R. Conf. Rep. No. 988, 106th Cong., 2d Sess., 105 (2000). Thus, to some extent, these congressional conferees agree with Oti Kaga. Despite this statement, Congress has done nothing to close the "loophole" of 24 C.F.R. § 92.201(b)(5) which allows states to continue to act as criticized by the conferees. The court notes, however, that the conferees spoke of Native American non-profit entities being allowed "to compete" for funds. No mention is made of any entitlement.

[¶ 16.] Complicating matters even further is the position of HUD. Mr. Cardell Cooper, an Assistant Secretary of HUD, when questioned whether 24 C.F.R. § 92.201(b)(5) is permissive, thereby giving support to SDHDA's position, concluded that it does grant a state discretion to decide whether to disburse funds in Indian Country. While Assistant Secretary Cooper's letter says nothing about the inequity of including the needs of Native Americans in a state's consolidated plan and then refusing to disburse any funds in Indian Country, the Assistant Secretary is rather forceful in his conclusion that 24 C.F.R. § 92.201(b)(5) means what it says, namely, that states "may" fund projects on Indian reservations.

[¶ 17.] Thus, the dispute between the parties concerning the disbursement of HOME funds on Indian reservations, the effect of NAHASDA, and the continued viability of 24 C.F.R. § 92.201(b)(5), goes well beyond the instant case. The court is unaware of any further action by either Congress or HUD regarding this dispute. These, of course, are largely political questions, and their resolution lies not with the federal courts but with Congress and the executive branch.

### D. Factual Background

[¶ 18.] This saga began in 1995 with Mr. David Bland, an individual who has a history of working to obtain tax credits. Mr. Bland incorporated a business in Minnesota called Housing and Community Development, Inc. Mr. Bland hoped to establish a relationship with Indian tribes to help them with housing shortages. Mr. Bland had correctly recognized that South Dakota's Indian reservations were grossly underserved. Specifically, Mr. Bland wanted to assist the tribes with the tax credit program.

[¶ 19.] In October of 1995, Mr. Bland attended a meeting of SDHDA where he met an employee of Oti Kaga. Following that meeting, Mr. Bland contacted Mr. William Picotte, a current board member of Oti Kaga who has been with the corporation since its inception in 1993. Following that

initial conversation, Mr. Bland went to Eagle Butte, South Dakota, a community within the Cheyenne River Sioux Indian Reservation, to meet with Mr. Picotte. These contacts were fruitful, resulting in a business relationship between Mr. Bland and Oti Kaga for the purpose of assistance in the development of a tax credit financed housing project. Technically, Mr. Bland was a consultant to Oti Kaga. Mr. Bland played a similar role with three other Native American housing agencies in South Dakota.

[¶ 20.] In the spring of 1996, Mr. Bland and Oti Kaga prepared an application for tax credits to be submitted to SDHDA for what Oti Kaga called the Elk View I project. At the same time, Mr. Bland submitted three other applications on behalf of three other Native American entities, one of which served the Pine Ridge Indian Reservation in southwestern South Dakota.[1]

[¶ 21.] In the spring of 1996, SDHDA received 23 new applications for tax credits. Four of the applications came from Indian sponsors, including Oti Kaga, with the remainder having been submitted by non-Indian entities. It was the largest ever submission of applications to SDHDA for tax credits. Following their receipt, a subcommittee of SDHDA met and considered the applications in accordance with the provisions of Internal Revenue Code § 42, parts of which are set forth above. Pursuant to the then-existing "qualified tax credit allocation plan," the subcommittee ranked the various applications from 1–23, with one signifying the highest rated or most attractive application.

[¶ 22.] During the subcommittee's consideration of the applications in the spring of 1996, the qualified tax credit allocation plan contained "readiness to proceed" as a criterion to be considered. The court is unsure whether "readiness to proceed" was factored into the rankings or whether it was considered after the rankings were complete. In any event, it is the use of that criterion, Oti Kaga alleges, that permitted invidious racial discrimination to creep into the tax credit allocation award process.

[¶ 23.] On the rankings, Oti Kaga's application fared rather well, receiving a rank of six. The tax credit awards were not immediately awarded following the rankings. Thus, the court believes that the "readiness to proceed" criterion was applied following the completion of the rankings.[2] Oti Kaga did not receive an award of tax credits. Neither did some of the other highly ranked applications that had been submitted by non-Indian sponsors. When the final awards were announced, all tax credit awards but one went to non-Indian entities. The Pine Ridge reservation received an allocation of tax credits although its application was ranked less favorably than Oti Kaga's, receiving a score of eight.[3]

---

1. It is noted that these other Indian sponsors who worked with Mr. Bland are not a part of this lawsuit. Even though two of the other Indian sponsors were treated like Oti Kaga, Oti Kaga was the only one to file suit.

2. Whether Oti Kaga was "ready to proceed" with the Elk View I project, as compared to the other applications, is a hotly disputed issue in this case. Given the court's disposition of all the issues arising out of the 1996 tax credit allocation plan, however, this issue need not be resolved.

3. Darlys Baum, in her deposition, indicated that it was the "readiness to proceed" factor that weighed heavily against Oti Kaga and the other three Indian-sponsored applications. However, she indicated that SDHDA wanted to encourage Mr. Bland and the Indian tribes to continue their quest for tax credits, believing that they would be well used in Indian Country. She indicated that the Pine Ridge project received an award for two reasons: first, to reward Mr. Bland and the tribes for their hard work and to hopefully encourage them to try again once they had improved themselves from a "readiness to proceed"

[¶ 24.] A few months after SDHDA decided to deny Oti Kaga's application for tax credits, another entity that was originally awarded tax credits declined them. SDHDA then awarded those recaptured tax credits to Oti Kaga.

[¶ 25.] Oti Kaga claims it was discriminated against in the spring of 1996 although it received the very thing it sought just a few months later and has received it every year since. The defendants, arguing in support of their motion for summary judgment, advance various theories targeted at this segment of this litigation. Instead of going into those concerns now, however, the court will first finish the story and confront the entire case once all of the relevant facts have been articulated.

[¶ 26.] The remainder of this dispute centers on the HOME program and the awarding of grants pursuant thereto. In 1997, Oti Kaga was planning Elk View II, a housing initiative similar to the 1996 project of Elk View I. Oti Kaga sent an application to SDHDA for tax credits and a separate application for state HOME funds. Oti Kaga received the tax credit allocation, but the request for state HOME funds was denied. It is that decision which resulted in the other claims in this lawsuit.

[¶ 27.] Oti Kaga, echoing its sentiments about the initial denial of tax credits in 1996, believes that the decision to deny it state HOME funds was due to invidious racial discrimination. Disagreeing, the defendants proffer divergent reasons for the denial. They claim the decision to deny Oti Kaga HOME funds stems from the discretion afforded the states by virtue of 24 C.F.R. § 92.201(b)(5). Vona Johnson, not a defendant in this action but an employee of SDHDA during the applicable time frame, stated in her deposition that the denial was due to the perceived inequality of available federal funding for housing in South Dakota, it being her belief that the volume of housing money going to the reservations was out of proportion to the rest of the state. She believes that approximately 35% of all federal housing funds allocated to South Dakota go to Indian Country, despite the fact that Native Americans comprised, by virtue of the last census, roughly 11% of South Dakota's population.[4] Other SDHDA employees gave deposition testimony or statements to the effect that Indian tribes could no longer participate in the state HOME program because of NAHASDA. These varying and what Oti Kaga labels as inconsistent justifications for SDHDA's decision signal, Oti Kaga contends, racial discrimination.

[¶ 28.] Oti Kaga filed an amended complaint which lists eleven separate claimed causes of action. They are: (1) disparate treatment under the Fair Housing Act of 1968, 42 U.S.C. §§ 3604, 3605; (2) disparate impact under the Fair Housing Act of 1968, 42 U.S.C. §§ 3604, 3605; (3) violation of the right to contract, 42 U.S.C. § 1981; (4) violation of the property rights of citizens, 42 U.S.C. § 1982; (5) Civil Rights Act disparate treatment impact (Oti Kaga's wording), 42 U.S.C. §§ 1981, 1982; (6) negligent performance of statutory obligations; (7) discrimination in the use of HOME funds, 42 U.S.C. § 12832; (8) discrimination in Title VI programs (disparate treatment), 42 U.S.C. § 2000d; (9) Internal Revenue Code invalidates allocations (Oti Kaga's terminology), IRC

---

standpoint, and, second, because the Pine Ridge project was located in a qualified census tract, an approved criterion from IRC § 42(m)(1)(B)(ii)(lll). Due to an error in reading a map, SDHDA failed to realize that the Oti Kaga project was also located in a qualified census tract. This, SDHDA admits, would have made a difference in their decision on the front end.

4. The court is unsure whether the deponent is referencing the 1990 or 2000 census.

§ 42(m); (10) state Fair Housing Act, SDCL Ch. 20–13; and (11) deprivation of rights under color of law, 42 U.S.C. § 1983.

[¶ 29.] In response to the amended complaint, the defendants filed a motion for summary judgment on the following grounds: standing, political question doctrine, mootness, qualified immunity, the inability of a corporation to recover damages for personal injury, statute of limitations, the inability to prove intentional discrimination, a failure to exhaust state administrative remedies, and failure to join indispensable parties. Because of the many different alleged causes of action, the various arguments for summary judgment, and the fact that this lawsuit alleges racial discrimination in two separate federal programs in two separate time frames, the court, to resolve the motion for summary judgment, must traverse through a cumbersome quagmire. To aid in that process, the court will first address the issue of standing. Next, the court will discuss Oti Kaga's requested damages for various claimed personal injuries. Following that, the court will address the remaining causes of action individually.[5]

5. Before turning to that endeavor, however, the court feels compelled to state that it, because of its unique geographical jurisdiction over the Northern and Central Divisions of the District of South Dakota, is acutely aware of the myriad of problems that Native Americans on the reservations face daily. This court, by virtue of its criminal jurisdiction, knows the reservations well. The court has heard voluminous testimony in other cases explaining the dire shortage of housing in Indian Country. It is commonplace for generations of a family to live together under one roof. Moreover, that one roof is likely in a sad state of disrepair, not because of its inhabitants, but because of the general poverty and the lack of any meaningful economic opportunities on the reservation.

## LEGAL ANALYSIS

### A. Summary Judgment Standard

[¶ 30.] The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See Hanson v. North Star Mutual Insurance Co.*, 1999 DSD 334 ¶ 8, 71 F.Supp.2d 1007, 1009–1010 (D.S.D.1999), *Gardner v. Tripp County*, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D.1998), *Patterson Farm, Inc. v. City of Britton*, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088–89 (D.S.D.1998), and *Smith v. Horton Industries*, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D.1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Donaho v. FMC Corp.*, 74 F.3d 894, 898 (8th Cir.1996). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995).

### B. Standing

[¶ 31.] The issue of standing goes directly to this court's jurisdiction. *See Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), and *Central South Dakota Coop. Grazing District v. Secre-*

In addition, this court, because of its large criminal caseload that is almost entirely comprised of Native Americans, enjoys a unique perspective into Indian Country not shared by many others, specifically those in Congress. Because of the closeness between this court and Indian Country, this court, upon an allegation of racial discrimination against Native Americans, reviews the case with the utmost scrutiny. The court is all too familiar with the deleterious effects of past and present racial discrimination in the United States, including South Dakota, as to Native Americans, and is dedicated to ensuring that the Constitution and the many other civil rights statutes are fully viable on South Dakota's Indian reservations. It is with that zeal that the court considers this case.

**1158**

*tary of Agriculture,* 266 F.3d 889, 895 (8th Cir.2001). As the Eighth Circuit stated in *Tarsney v. O'Keefe,* 225 F.3d 929, 934 (2000):

> Standing is "the threshold question in every federal case ... [.]" *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Federal court jurisdiction is "defined and limited by Article III of the Constitution ... [and] is constitutionally restricted to 'cases' and 'controversies.'" *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). A case or controversy exists only if a plaintiff "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). If a plaintiff has not suffered an injury, there is no standing and the court is without jurisdiction to consider the action. *See Allen v. Wright,* 468 U.S. 737, 750–66, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

It is thus appropriate to resolve this issue first.

[¶ 32.] Before the court addresses the standing issue, however, it must first ascertain what interests Oti Kaga may advance and for what claimed causes of action. Oti Kaga believes it "is entitled to assert the constitutional rights of members of the Cheyenne River Sioux Tribe." Brief in support of plaintiff's response to defendants' motion for summary judgment, p. 2. Oti Kaga does not attempt to explain how a nonprofit corporation that focuses on low-income housing may even claim to represent the entire Cheyenne River Sioux

Tribe or any of its members as such. As noted above, neither the Tribe nor any of its members are parties to this litigation. While the court might be more receptive to a claim that Oti Kaga represents those Native Americans who cannot obtain low-income housing, Oti Kaga shoots for the moon. Nothing has been submitted from the Cheyenne River Sioux Tribe denominating Oti Kaga as the chief litigator of tribal interests. To the contrary, the Tribe has apparently chosen to remain out of this lawsuit.

[¶ 33.] Moreover, Oti Kaga never discusses or reveals its composition. Is it an entity with officers, a board, and employees? Are all members of the Cheyenne River Sioux Tribe automatically members of Oti Kaga? Those unanswered questions are important because Oti Kaga cites and discusses various cases which it claims stand for the proposition that having a "constituency" is sufficient for the allowance of representational standing.[6] *See, e.g., NAACP v. Alabama,* 357 U.S. 449, 458–459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and *Church of Scientology of California v. Cazares,* 638 F.2d 1272 (5th Cir.1981). Oti Kaga, however, never explains the composition of its alleged "constituency." The court is convinced that Oti Kaga believes its "constituency" is all Cheyenne River Sioux Tribal members. But that cannot be the case. Not all members of the Cheyenne River Sioux Tribe need low-income housing. Some have it now. Others have no need for it.

[¶ 34.] Moreover, using the factors enunciated in *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)[7], regard-

---

**6.** The court expresses no opinion on Oti Kaga's statement that constituency plays any role in a representational standing analysis. The court merely uses it here for simplicity.

**7.** Oti Kaga cites *Hunt* as 432 U.S. 333, 334, 97 S.Ct. 2434, 53 L.Ed.2d 383. Page 334, 97

S.Ct. 2434, however, is merely the syllabus of the Court. Counsel should certainly know that the syllabus comprises no part of the Supreme Court's decision and should not be cited. The *Hunt* factors found in the syllabus are actually listed in the opinion.

ing representational standing, it is clear that Oti Kaga is not entitled to represent anyone other than itself. The *Hunt* factors are: (1) the members must otherwise have standing to sue in their own right; (2) the interests sought to be protected must be germane to the organizational purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. As the above discussion foreshadowed, Oti Kaga cannot meet the first *Hunt* factor. Who are the members of Oti Kaga? No answer is ever given to that important question. Instead, Oti Kaga simply assumes that all members of the Cheyenne River Sioux Tribe are also its members. As discussed above, however, that is not true. Moreover, Oti Kaga documents not one Native American on Cheyenne River who was deprived of low-income housing by the defendants. It is speculation as to who Oti Kaga's members are, if any, and who, if anyone, would have a right to sue in his or her own right. Without identifying someone who could sue in his or her own right, Oti Kaga will not be granted representational standing. Oti Kaga also fails the third *Hunt* factor as will later appear.

[¶ 35.] Having bypassed the representational standing detour from the overall standing inquiry, the court will now turn to the standing issue generally. To aid in this analysis, the court will adhere to its separation of Oti Kaga's basic claims into two parts, the 1996 tax credit allocation and the HOME program.[8]

■ [¶ 36.] The United States Supreme Court has made clear that standing under the Fair Housing Act is to be liberally construed to the full limits of Article III. *See Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). In conducting an Article III standing inquiry, the Supreme Court's decision in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), controls. Under *Lujan,* a party has Article III standing if it can show (1) an injury in fact that is both (a) concrete and particularized, and (b) actual or imminent, rather than conjectural or hypothetical, (2) the existence of a causal connection between the alleged injury and the defendants' conduct, i.e., that the injury is fairly traceable to the challenged action, and (3) that it is likely that a favorable decision will redress the injury. *Lujan,* 504 U.S. at 560–561, 112 S.Ct. 2130.

■ [¶ 37.] In focusing on the 1996 tax credit allocation portion of this case, the court determines that Oti Kaga has not suffered "an injury in fact." *Id.* This dovetails with the defendants' argument regarding mootness. The alleged injury, if any, occurred in 1996. While Oti Kaga was initially denied tax credits, it eventually received them. Moreover, the criterion that Oti Kaga strenuously objects to, namely "readiness to proceed," has been removed from SDHDA's consideration since 1996. Thus, other than the few months that Oti Kaga had no tax credits in 1996, it has suffered no harm.

■ [¶ 38.] The conclusion reached above necessarily implicates the third *Lujan* factor. It is clear that there is no relief this court could fashion that would redress any alleged injury. Since SDHDA has not

---

**8.** The court, in separating these events into two categories, is very mindful of Oti Kaga's contention that the racial discrimination it claims it has endured, (although, of course, a corporation cannot be the subject of racial discrimination), spans rather seamlessly these two time periods. Separating the events, however, is necessary for simplicity. In doing so, the court remains aware of Oti Kaga's allegation of ongoing, continuous discrimination.

used the "readiness to proceed" criterion in nearly five years, it is a useless act to permanently enjoin them from using it. This court is simply not in the business of issuing permanent injunctions for highly speculative claims of feared future injury. While it is conceivable that Oti Kaga may have suffered some compensable injury in 1996 prior to being awarded the tax credits, Oti Kaga fails to articulate what that injury was. In fact, the primary relief requested by Oti Kaga to redress its claimed 1996 injuries is for this court to rescind and reallocate the tax credits awarded in 1996. This request is, very frankly, ridiculous. First, the entities that received those allocations are not parties to this lawsuit. Neither is the Internal Revenue Service. Oti Kaga, it seems, wants to deprive various unknown entities of property rights that they received five years ago without so much as giving them notice or an opportunity to be heard. Such a request completely ignores the fundamental constitutional principle of due process of law. It is a claim that no lawyer should even suggest.

[¶ 39.] Second, it strains all imagination why Oti Kaga would want to rescind and reallocate tax credit awards made in 1996 when it eventually received an award itself. It gained what it wanted and has similarly gained them every year since. What Oti Kaga would hope to gain by such a fanciful form of relief is beyond the comprehension of the court. It is a frivolous request and should be denied.

[¶ 40.] The court concludes (1) that Oti Kaga does have standing to assert its own interests, whatever they may be, and not those of anyone else, and (2) that Oti Kaga lacks standing to pursue any claim arising from the 1996 tax credit allocation process.[9] All that remains, therefore, is HOME.

[¶ 41.] The standing inquiry in regards to HOME, however, produces a different result. The injury, i.e. not receiving state HOME funds, is concrete, particularized and, most importantly, ongoing. It is traceable to the actions of defendants and could perhaps be redressed by a favorable decision. Thus, Oti Kaga does have standing regarding its allegations of racial discrimination in South Dakota's administration of the HOME Program. Before turning to those allegations, however, the court must first jettison other entirely frivolous appendages of this litigation.

## C. Relief for Personal Injuries

[¶ 42.] Throughout the amended complaint, Oti Kaga requests compensato-

---

**9.** It must be noted that even if this court were to believe that Oti Kaga did have standing to pursue the 1996 claims, they would be foreclosed by both mootness and the statute of limitations. As discussed above, SDHDA has not used "readiness to proceed" since 1996 and Oti Kaga has received tax credits each time it has applied for them. Those two facts effectively moot that dispute. In addition, the court believes that the statute of limitations precludes any discussion of the 1996 tax credit allocations. Where a federal statute does not specify a statute of limitations, a court is to utilize the most analogous state statute of limitations. *See Wilson v. Garcia,* 471 U.S. 261, 266, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In this case, defendants are correct in pointing to South Dakota's personal injury statute of limitations, SDCL 15–2–14, and South Dakota's statute of limitations regarding civil rights actions, SDCL 15–2–15.2. Both employ a three year statute of limitations. Thus, Oti Kaga's time period expired in 1999, well before this case was instituted. Oti Kaga, in trying to refute the statute of limitations argument, contends that ongoing racial discrimination tolls any applicable statute of limitations. Whatever the merits of that argument may be, there is simply no evidence of any discrimination in this case. The statute of limitations, whichever one is selected, would have expired prior to this case being commenced.

ry damages for various personal injuries, including mortification, nervous tension, indignation, distress, humiliation, embarrassment, hurt feelings, and mental anguish. Such claimed damages are wholly without merit and warrant the imposition of Fed.R.Civ.P. 11 sanctions. It defies all common sense that a corporation could even claim to have hurt feelings, to suffer from nervous tension or to feel embarrassed. The court was so shocked that a corporation (and its lawyers) would request damages for such alleged injuries that the court sent a memorandum to the parties, Doc. 40, ordering Oti Kaga, under the penalty of Rule 11, to explain, with appropriate legal citation, the grounds for claiming relief for such injuries. Instead of addressing the court's concerns, Oti Kaga chose to discuss representational standing, arguing that if Oti Kaga is granted representational standing it will then be allowed to recover such damages. As authority, Oti Kaga cited and discussed cases dealing with organizational standing in cases where entities sought either injunctive and declaratory relief or nominal damages. Oti Kaga did not attempt to address the claimed rights of a corporation to recover damages for indignation, humiliation, or similar claimed injuries.

[¶ 43.] Since Oti Kaga did not see fit to retreat from these completely frivolous claims, the court is required to address them. Not surprisingly, there is very little law on the subject, as anyone knows that a corporation cannot shed tears, suffer panic attacks, or endure sleepless nights. As Chief Justice Marshall stated nearly two hundred years ago, "[a] corporation is an artificial being, invisible, intangible, and existing only in the contemplation of law." *Trustees of Dartmouth College v. Woodward*, 4 Wheat. 518, 17 U.S. 518, 636, 4 L.Ed. 629 (1819). Oti Kaga fails to explain how an artificial being that is invisible, intangible and existing only in the contemplation of the law

can suffer the types of injuries described above. Its meritless argument of representational standing notwithstanding, there is no authority whatsoever for a corporation to recover compensatory damages for personal injuries.

[¶ 44.] In *Lurzer v. AlliedSignal, Inc.*, the court summarily rejected the notion that a corporation can recover for personal injuries, succinctly stating that only individuals can recover for such damages. 1998 WL 102637 (N.D.Ill.). The United States Supreme Court, in an opinion from the nineteenth century, put it best: "[A]s a corporation cannot be said to have life or health or senses, the only ground on which it can obtain either damages or an injunction ... is injury to its property." *Northern Pac. R. Co. v. Whalen*, 149 U.S. 157, 163, 13 S.Ct. 822, 37 L.Ed. 686 (1893). Therefore, all requests for personal injury damages allegedly suffered by this corporation are completely without merit. There is no genuine issue of material fact concerning this issue and defendants, therefore, are entitled to judgment as a matter of law.

### D. HOME Causes Of Action

### Count I

[¶ 45.] Count I of Oti Kaga's amended complaint alleges intentional discrimination and disparate treatment on account of race in violation of the Fair Housing Act of 1968, 42 U.S.C. §§ 3604 and 3605 ("FHA"). Courts, in assessing disparate treatment claims brought under the FHA, use the mode of analysis that has been developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. *See Ring v. First Interstate Mortgage, Inc.*, 984 F.2d 924, 926 (8th Cir.1993) (adopting the burden-shifting analysis of *McDonnell Douglas* to disparate treatment claims under the FHA). In order to recover, Oti Kaga must first establish the

following *prima facie* case: (1) that it is a member of a protected class; (2) that it applied for and was qualified to receive funds from the defendants; (3) that the funds were rejected despite Oti Kaga's qualifications; and (4) that the defendants continued to disburse funds to others with qualifications similar to Oti Kaga's. *Id.* If Oti Kaga could successfully show a *prima facie* case, the burden then would shift to the defendants to articulate some legitimate, nondiscriminatory reason for their action. *See United States v. Badgett,* 976 F.2d 1176, 1178 (8th Cir.1992). If the defendants satisfy this burden, Oti Kaga then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons asserted by the defendants are in fact mere pretext. *See id.* Oti Kaga fails at every step of the analysis. *See, e.g., Evers v. Alliant Techsystems, Inc.,* 241 F.3d 948, 959 (8th Cir.2001) (affirming the district court's grant of summary judgment because there was no evidence of discrimination), and *LaCroix v. Sears, Roebuck, and Co.,* 240 F.3d 688, 693 (8th Cir.2001) (stating that the record was devoid of any evidence of discrimination under *McDonnell Douglas;* the grant of summary judgment was affirmed).

[¶ 46.] Oti Kaga has failed to establish a *prima facie* case because it cannot establish that it is a member of a protected class. Just as a corporation cannot suffer personal injury, a corporation cannot be an entity of "color," for it makes no sense at all that an artificial entity that is invisible and existing only in the contemplation of law can have a "race." *See, e.g., Village of Arlington Heights v. Metropolitan Housing Dev. Co.,* 429 U.S. 252, 263, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (stating that "a corporation . . . has no racial identity and cannot be the direct target of the alleged discrimination").[10] While it is certainly true that a for-profit corporation's officers, stockholders, and directors and a nonprofit corporation's members can consist of people of minority races and exclusively serve a minority group, it does not follow that the legal fiction that is a corporation takes on that racial profile. Can the individual members who work for Oti Kaga be members of a protected class? Certainly. Can the individual members of the Cheyenne River Sioux Tribe be members of a protected class? Of course. They did not sue. The corporation did. Corporations, by and of themselves, do not have "races."

[¶ 47.] Even if Oti Kaga could establish the *McDonnell Douglas prima facie* case, they would still be precluded from any recovery because the defendants have met their burden of articulating a nondiscriminatory reason for their actions and Oti Kaga has failed to establish pretext. *See Badgett,* 976 F.2d at 1178. As dis-

10. Although some lower courts dismiss this pronouncement as mere *dicta, see Triad Assoc., Inc. v. Robinson,* 10 F.3d 492, 499 n. 5 (7th Cir.1993), *Gersman v. Group Health Ass'n, Inc.,* 931 F.2d 1565 (D.C.Cir.1991), *vacated on other grounds,* 502 U.S. 1068, 112 S.Ct. 960, 117 L.Ed.2d 127, *reinstated* 975 F.2d 886 (1992), and *Rosales v. AT & T Information Systems, Inc.,* 702 F.Supp. 1489, 1494 (D.Colo.1988), the Supreme Court has never disowned it. Because the Supreme Court has yet to speak again on the issue and because there is no guidance on the topic from the United States Court of Appeals for the Eighth Circuit, this court will adhere to it. *See Unit-* ed States v. Maynie, 257 F.3d 908, 918 (8th Cir.2001) (stating that a court's obligation is to follow what the Supreme Court has said, not guess at what it might say in the future). Moreover, in light of the fictional nature of a corporation, the Supreme Court's statement that a corporation has no racial identity and cannot be the target of discrimination makes sense. While members in or stockholders of the corporation have a racial identity, the corporation has an identity that is separate and distinct from that of its members and organizers. *See Moline Properties v. Commissioner,* 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943).

cussed above, 24 C.F.R. § 92.201(b)(5) expressly states that a state *may* fund projects on Indian reservations (emphasis added). Certainly SDHDA's reliance on a valid federal rule is a legitimate, nondiscriminatory reason for its decision. While there is a dispute about the propriety of the rule after the HOME Indian set-aside was repealed, the rule is, nonetheless, still of full force and effect. The United States government, the source of the rule, is not a party in this action. Obviously, some members of Congress disapprove of the actions of SDHDA; that disapproval says nothing about the reasonableness of SDHDA's reliance on 24 C.F.R. § 92.201(b)(5). HUD's position supporting SDHDA's reliance on the rule buttresses the defendants' position and, most certainly, signals the confusion and tension surrounding this issue.

[¶ 48.] Oti Kaga argues, however, that proof of SDHDA's discrimination lies in what Oti Kaga believes are inconsistent statements or justifications for its decision. In addition to the reliance on 24 C.F.R. § 92.201(b)(5), other employees of SDHDA believed that Oti Kaga was denied state HOME funds because of a perceived imbalance in the amount of federal housing funds going to the reservations compared to the rest of the state and because individuals working for SDHDA believed that NAHASDA prohibited SDHDA from disbursing state HOME funds on Indian sponsored projects.[11] Both reasons are legitimate and nondiscriminatory. One legitimate, nondiscriminatory reason need not be unanimously adhered to, provided that the other proffered justifications are legitimate and non-

discriminatory as well. *See, e.g., Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir. 1997) (accepting three different reasons for the defendant's action as legitimate and nondiscriminatory). In this case, all of the rationales advanced by various individuals within SDHDA are legitimate and nondiscriminatory. Thus, defendants have successfully met their burden under the *McDonnell Douglas* analysis.

[¶ 49.] Oti Kaga, with the defendants having met their burden, was afforded the opportunity to show that the defendants' reasons for their actions are mere pretext. *See Badgett,* 976 F.2d at 1178. It has failed to do so. In fact, Oti Kaga has failed to show anything. Instead of coming forward with evidence, Oti Kaga chose to rely on mere allegations. It argues that nothing within 24 C.F.R. § 92.201(b)(5) mandates the exclusion of Indian projects from state HOME funding. That is true but it completely misses the point. The rule gives SDHDA discretion and SDHDA exercised it. Complaining that nothing within the statute that confers the discretion mandated SDHDA's decision says nothing, nothing at all, about the issue of possible racial discrimination. Obviously, if a statute or a rule confers discretion it will not mandate any particular outcome.

[¶ 50.] The only evidence that Oti Kaga points to that even possibly indicates racial discrimination is a statement allegedly made by an SDHDA employee who stated that SDHDA felt it needed to give one Indian sponsor an award of tax credits in 1996. This, however, relates to the tax credit issue which Oti Kaga does not have standing to assert. Even if it did relate

---

**11.** That interpretation of NAHASDA, whether ultimately correct or not, is reasonable. As discussed earlier, at least one commentator takes the position that Indian tribes are no longer eligible to participate in the state HOME program because NAHASDA is the "exclusive" block grant housing formula. *See*

Kenison, 8 SPG J. Affordable Housing & Community Dev. L. at 253. Employees of SDHDA arriving at the same conclusion, therefore, signal a not unreasonable or arbitrary interpretation of NAHASDA's effect, and not, as Oti Kaga contends, an intent to discriminate.

to HOME, it still would not be evidence of anything. It simply means that SDHDA decided to give an Indian sponsor an award of tax credits. It is pure fiction that a statement evidencing a desire to award an Indian sponsor an award of tax credits signals a desire to discriminate against Native Americans. Oti Kaga's attempt to contort that statement into evidence of discrimination simply demonstrates that no good deed goes unpunished.

[¶ 51.] There is no genuine issue of material fact as to Count I. Oti Kaga has failed to establish a *prima facie* case of discrimination under the *McDonnell Douglas* framework. Even assuming that it could make such showing, Oti Kaga has failed to point to any evidence that SDHDA's legitimate, nondiscriminatory reasons for its decision are mere pretexts for racial discrimination. The defendants are entitled to judgment as a matter of law on Count I. *See LaCroix*, 240 F.3d at 693.

### Count II

[¶ 52.] The second alleged cause of action in the amended complaint is a disparate impact claim under the Fair Housing Act. In essence, Oti Kaga alleges that the defendants have a facially neutral pattern or practice that produces a disparate impact on Native Americans. The Eighth Circuit has yet to squarely address the Fair Housing Act on a disparate impact theory. *Cf. Badgett*, 976 F.2d at 1179 (strongly indicating that disparate impact actions under the FHA are permissible). Other circuits do permit such claims. *See, e.g., Hack v. President and Fellows of Yale College*, 237 F.3d 81 (2nd Cir.2000), *Buckeye Community Hope Foundation v. City of Cuyahoga Falls*, 263 F.3d 627 (6th Cir.2001), *Katz v. Regents of the University of California*, 229 F.3d 831 (9th Cir.2000), and *Keys Youth Services, Inc. v. City of*

*Olathe, Kansas*, 248 F.3d 1267 (10th Cir. 2001).

[¶ 53.] To recover under this theory, Oti Kaga must show that (1) the defendants employed a particular housing policy or practice that imposes a disproportionate burden on a protected group, and (2)(a) the defendants failed to demonstrate that the challenged practice is reasonably necessary to achieve a legitimate business objective, or (b) the defendants unreasonably refused to adopt an alternative housing practice that would provide a comparably effective means of meeting the defendants' objective without imposing significant additional costs. *See Hack*, 237 F.3d at 102 (Moran, J., dissenting in part) (surveying the history of the disparate impact cause of action generally and how it operates in the FHA arena specifically).

[¶ 54.] Greatly frustrating the analysis of this disparate impact claim is Oti Kaga's failure to identify any particular policy or practice employed by SDHDA that produces a disparate impact. Instead of identifying such a policy or practice, Oti Kaga blindly claims past and current discriminatory actions, without description. Thus, the court is left with the unenviable task of trying to decipher what the complaints of Oti Kaga might be.

[¶ 55.] At first glance, it would appear that SDHDA's use of "readiness to proceed" could potentially run afoul of the Fair Housing Act and produce a disparate impact. However, any analysis of that issue is foreclosed because Oti Kaga lacks standing to assert that issue. That issue is moot [12] and is barred by the applicable statute of limitations. In turning to HOME, the court, after carefully reviewing everything on file herein, fails to find any policy or practice that may be claimed to produce a disparate impact in this case.

---

12. As has been noted earlier, that criterion has not been used since 1996.

The dispute in the HOME context centers on the meaning of 24 C.F.R. § 92.201(b)(5) and the discretion it affords SDHDA. SDHDA has adopted a policy, it could be argued, of interpreting 24 C.F.R. § 92.201(b)(5) against the interests of Oti Kaga and those similarly situated, but that interpretation, as discussed above, is certainly not unreasonable. It would be axiomatic indeed to turn a reasonable or at least not an unreasonable interpretation of existing law into a racially discriminatory policy or practice. If anything, 24 C.F.R. § 92.201(b)(5) itself produces the disparate impact, if any. That is a political issue for Congress and HUD, not for this court, as the propriety or the "fairness" of that rule is not before the court. Oti Kaga's claim of disparate impact under the Fair Housing Act is without merit. The defendants' motion for summary judgment on Count II, therefore, should be granted.

## Count III

[¶ 56.] The third count of the amended complaint alleges a violation of Oti Kaga's right to contract in violation of 42 U.S.C. § 1981. This allegation, however, focuses only on the 1996 tax credit allocation process. Thus, any meaningful consideration is barred as Oti Kaga has no standing to assert any issues arising from that program. Any such issues are moot and are time-barred.

[¶ 57.] Oti Kaga could still not recover. Claims brought under 42 U.S.C. § 1981 are analyzed under the same *McDonnell Douglas* burden-shifting analysis discussed above. *See Roark v. City of Hazen,* 189 F.3d 758, 761 (8th Cir.1999). For the same reasons discussed above, i.e. Oti Kaga's failure to establish a *prima facie* case and, even assuming the presence of a *prima facie* case, its failure to submit any evidence that the defendants' nondiscriminatory reasons are pretextual, defendants' motion for summary judgment should be granted as to this count.

## Count IV

[¶ 58.] Oti Kaga alleges a violation of 42 U.S.C. § 1982, which protects the property rights of American citizens. The Eighth Circuit has apparently not dealt with this statute in the exact context urged by Oti Kaga. Other courts, in reviewing this statute, require the plaintiff to demonstrate (1) an interference with property rights, which interference was (2) motivated by racial prejudice. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse–Wisconsin, Inc.,* 991 F.2d 1249, 1257 (7th Cir.1993). Oti Kaga cannot make that showing.

[¶ 59.] Count IV, like Count III, focuses only on the 1996 tax credit allocation process, which Oti Kaga may not pursue for the reasons discussed above. Moreover, even if Oti Kaga might be permitted to continue, any recovery would be precluded because Oti Kaga has pointed to no evidence that SDHDA was motivated by racial prejudice. If anything, in the 1996 tax credit time frame, SDHDA evidenced an intent to work with and assist Indian sponsors. Defendants' motion for summary judgment on Count IV should be granted as well.

## Count V

[¶ 60.] Oti Kaga captions the alleged cause of action as "Civil Rights Act Disparate Treatment Impact." The court has no idea what this means. In the civil rights context, the terms "disparate treatment" and "disparate impact" have very different, well-defined meanings. Oti Kaga cites 42 U.S.C. §§ 1981 and 1982 as the statutory roots for this count. Those sections, however, were covered in counts III and IV. It seems that this count is part of the "kitchen sink" that was thrown at this court. It seeks compensation for damaged feelings. It seeks compensation for the damaged feelings of other Indian persons.

How can a corporation have damaged feelings? Exactly who are these other Indian persons? How many are there? This entire count makes no sense whatsoever. Sanctions under Rule 11 could once again be applicable. Defendants' motion for summary judgment should be granted as to Count V.

## Count VI

[¶ 61.] In this count, Oti Kaga seeks recovery for the negligent performance of statutory duties. Oti Kaga claims that the defendants breached a duty of ordinary care that SDHDA owes to Oti Kaga in the tax credit allocation process. While trying to lay out this negligence cause of action, Oti Kaga alleges that the defendants acted intentionally and maliciously. How can one intentionally and maliciously act in a negligent manner? They are mutually exclusive concepts. But not in this lawsuit, where a corporation seeks recovery for emotional and mental distress, embarrassment, mortification, and humiliation. Just as the court will prohibit a corporation from receiving any compensation for such alleged damages, the court will likewise prohibit any recovery for alleged "intentional negligence." The court does not condone such imaginary and fanciful causes of action, raising once again the possibility of Rule 11 sanctions. Defendants' motion for summary judgment on this count should be granted.

## Count VII

[¶ 62.] As its seventh cause of action, Oti Kaga alleges a violation of 42 U.S.C. § 12832 which prohibits discrimination in the use of HOME funds. That statute states, in relevant part:

No person in the United States shall on the grounds of race, color, national origin, religion, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under this subchapter.

42 U.S.C. § 12832. Oti Kaga assumes, without discussion, that this section authorizes a private right of action. The court, however, believes otherwise.

[¶ 63.] The statute does not expressly authorize a private right of action. It does not list or discuss any potential relief. *Compare* 42 U.S.C. § 1981a. Moreover, the court could find no case where 42 U.S.C. § 12832 served as the basis for any recovery and Oti Kaga cites none.

[¶ 64.] Although 42 U.S.C. § 12832 does not expressly authorize a private right of action, it does not automatically follow that no such action is permissible. Courts have been implying such rights of action from ambiguous statutes for years. *See, e.g., Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (finding an implied cause of action for the private enforcement of Title IX). In this case, however, Oti Kaga has not asked this court to imply such an action; the court declines to *sua sponte* do so. By simply assuming that 42 U.S.C. § 12832 afforded it a private right of action, Oti Kaga assumed too much.

[¶ 65.] Even if 42 U.S.C. § 12832 could be said to create a private right of action, Oti Kaga's hopes would fare no better. Oti Kaga has no race, color, national origin, religion or sex and has no standing as to this statute. Also, as has been stated several times above, Oti Kaga presents no evidence of any discrimination. Without pointing to any credible evidence, Oti Kaga cannot recover for racial discrimination, no matter what statute it points to as having been violated. At the summary judgment stage of the proceedings, simply rehashing one's accusations and allegations is not sufficient; evidence is required. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986) and *Thomas v. Hungerford*, 23 F.3d 1450, 1454 (8th Cir.1994). The defendants' motion for summary judgment on this count should be granted.

## Count VIII

[¶ 66.] In Count VIII, Oti Kaga alleges discrimination in a Title VI program in violation of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, which prohibits the exclusion of anyone in a federally-assisted program on account of race, religion, national origin, and color. This count alleges disparate *treatment* and not disparate *impact*. The Supreme Court has recently forbidden disparate *impact* actions under 42 U.S.C. § 2000d. *See Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

[¶ 67.] In evaluating disparate treatment actions under 42 U.S.C. § 2000d, this court is to utilize the same *McDonnell Douglas* burden-shifting analysis described above. *See Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir.1998). As use of the *McDonnell Douglas* analysis has already doomed two of Oti Kaga's claims, it dooms this claim as well. Oti Kaga points to no evidence that the defendants' legitimate, nondiscriminatory reasons for its actions in this case are mere pretexts for racial discrimination. In trying to refute this argument, Oti Kaga simply advances the same argument, namely, that SDHDA's interpretation of 24 C.F.R. § 92.201(b)(5) is unreasonable. The court has already determined that SDHDA's interpretation of the regulation is not unreasonable and is within the bounds of the law. It is the duty of Congress, and not this court, to decide if 24 C.F.R. § 92.201(b)(5) needs retooling. Defendants' motion for summary judgment should be granted as to this count.

## Count IX

[¶ 68.] In Count IX, Oti Kaga has once again ventured into the realm of ignoring basic constitutional principles, advancing a wholly frivolous cause of action. Oti Kaga argues that SDHDA adopted tax credit allocation procedures that were in violation of South Dakota's open-records laws and the Internal Revenue Code § 42(m). For relief, Oti Kaga asks this court to rescind SDHDA's tax credit allocation awards for various years and reallocate them. Oti Kaga makes this request knowing that none of the entities that received such awards are named in this lawsuit. Obviously the concept of due process, with its guarantees of notice and an opportunity to be heard, have not been considered by Oti Kaga.

[¶ 69.] As noted above, the court, when it initially read this claimed cause of action (and others), was greatly alarmed. In its memorandum to Oti Kaga requesting that it explain, with appropriate legal citations, the legal justification for this imaginary cause of action, Oti Kaga responded by admitting that there was no justification for it. It labeled this theory as "novel" and discussed one case, without citation, from Iowa, where, it alleges, a finance agency was required to rescind its tax credit allocations. Oti Kaga simply ignored the court's clear warning and questions. Whether the case in Iowa took place or not, the court does not know. If it did, the court is extremely confident that those who received the erroneous tax credit allocations were named as parties in the lawsuit. It shocks this court that an attorney would maintain an action that seeks to strip important benefits from a non-party when the court has already informed counsel that serious constitutional deficiencies exist. Instead of correcting them, Oti Kaga has clung to them in earnest. Needless to say, the specter of Rule 11 sanctions is raised once more. Defendants' motion for summary judgment on this count should be granted.

## Count X

[¶ 70.] In this count, Oti Kaga invokes this court's claimed supplemental jurisdiction, alleging a violation of South Dakota's Fair Housing Act, SDCL 20–13–20, arguing that the defendants are "owners of rights to housing or real property" and discriminated against Oti Kaga on account of race.

[¶ 71.] In response, defendants argue that this claim is barred due to Oti Kaga's failure to submit its claims of racial discrimination to the State Division of Human Rights. Upon review of South Dakota law, the defendants are correct. *See Montgomery v. Big Thunder Gold Mine, Inc.*, 531 N.W.2d 577, 579 (S.D.1995) (stating that the plaintiff's failure to exhaust administrative remedies precluded her sexual discrimination lawsuit), and *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 840 (S.D.1991) (holding that a failure to file a complaint with the Division of Human Rights is a failure to exhaust one's administrative remedies that is fatal to the discrimination claim).

[¶ 72.] Oti Kaga argues, however, that this is a housing discrimination lawsuit, thereby making it distinguishable from the above-cited cases. While the facts may be different, the rationale for the rule certainly applies to this case. As the South Dakota Supreme Court has stated, "[f]or the Division to achieve its human rights objectives, it must receive all sexual harassment complaints before such claims enter the judicial process." *Montgomery*, 531 N.W.3d at 579. Whether the complaint is sexual harassment or racial discrimination, the objectives of the Division of Human Rights remain the same. Chapter 20–13 of the South Dakota Codified Laws imposes on the Division the same obligations regarding racial discrimination as it does as to sexual discrimination. *See* SDCL 20–13–1 et seq. (prohibiting virtually all forms of discrimination, including discrimination based on race, sex, and physical disabilities). Thus, Oti Kaga simply argues a distinction that matters not.

[¶ 73.] Oti Kaga also argues that because it pursued an administrative remedy with HUD, it would have been redundant and futile to also file with the State Division of Human Rights. Nothing in SDCL Chapter 20–13, however, substitutes a complaint with a federal agency for that required to be submitted to the Division of Human Rights. The South Dakota Supreme Court has not dispensed with the exhaustion requirement in that manner. South Dakota law required Oti Kaga to file a complaint with the Division of Human Rights if it hoped to recover on any causes of action arising from South Dakota law. It did not do so in this case. Oti Kaga failed to exhaust its state administrative remedies, therefore entitling the defendants to summary judgment on this issue.

## Count XI

[¶ 74.] Oti Kaga's final cause of action is based on 42 U.S.C. § 1983, which prohibits the deprivation of rights by one acting under color of state law. However, Oti Kaga, in specifying which rights it believes have been violated, points to the statutory provisions discussed and rejected above. Having found no violation of the statutes cited in this count, it necessarily follows that there is no violation of 42 U.S.C. § 1983. The defendants' motion for summary judgment should be granted as to Count XI.

## E. Rule 11 Sanctions

[¶ 75.] The court is convinced that this case, particularly Oti Kaga's request for personal injury type damages, its request to rescind and reallocate tax credit awards from non-parties, its claim of negligent performance of statutory obligations, and its failure to candidly and forthrightly respond to the court's memorandum regard-

ing these issues, very likely warrants the imposition of sanctions. The court believes that counsel for Oti Kaga in all probability knowingly violated Rule 11 in several respects, including the prohibition of filing a lawsuit for improper purposes and by advancing legal theories that are totally unsupported in the law. The defendants have not sought sanctions. Rule 11 authorizes the court, on its own initiative, to impose sanctions. *See* Fed.R.Civ.P. 11(c)(1)(B). To do that, however, the court would be required to conduct a hearing to give Oti Kaga, specifically its counsel, the opportunity to demonstrate that sanctions should not be imposed. Oti Kaga's lead out-of-state attorney appears to be responsible for what has transpired in this case. Local counsel has apparently not been personally involved. If and when sanctions are sought by defendants pursuant to Rule 11, the court will consider them.

### *CONCLUSION*

[¶ 76.] Oti Kaga, prior to the defendants' motion for summary judgment, filed a motion, Doc. 37, seeking the court's permission to add certain indispensable parties. Oti Kaga seeks to significantly broaden the scope of this litigation, desiring to name various HUD personnel as defendants in this lawsuit. Nothing can be gained from that exercise. In light of the court's disposition of the motion for summary judgment, Oti Kaga's request for leave to add indispensable parties will be denied as moot.

[¶ 77.] There is no genuine issue of any material fact and defendants are entitled to judgment as a matter of law.

### *ORDER*

[¶ 78.] Now, therefore, based on the foregoing,

[¶ 79.] IT IS ORDERED

(1) Defendants' motion for summary judgment, Doc. 46, is granted.

(2) Oti Kaga's motion for leave to add indispensable parties, Doc. 37, is denied as moot.

(3) Costs shall be taxed by the clerk.